Filed 3/17/16

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE, | C078277 |
| Plaintiff and Respondent, | (Super. Ct. No. SC SC CR F 98-0001508) |
| v. | |
| RONALD LEE MYERS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Siskiyou County, Donald R. Langford, Judge. Affirmed.

Diane Nichols, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon, Peter W. Thompson, Deputy Attorney General, for Plaintiff and Respondent.

Defendant Ronald Lee Myers appeals from denial of his petition to resentence under the Three Strikes Reform Act of 2012 (Proposition 36) based on a finding that resentencing him would pose an unreasonable risk of danger to public safety. (Pen. Code, § 1170.126.)[1] He contends the trial court used the wrong standards to determine whether he posed a risk of danger, the trial court abused its discretion in making such finding, and he was entitled to have a jury, not a trial judge, make such finding. Disagreeing, we shall affirm.

## PROCEDURAL BACKGROUND

As recounted in our prior unpublished opinion, *People v. Myers* (Apr. 25, 2000, C032591) (*Myers I*), which is part of the record in this case, a jury convicted defendant of the felony of possession by a felon of ammunition (former § 12316, subd. (b)(1), later renumbered as § 30305, subd. (a)(1)), and two misdemeanors--assault (§ 240) and possession of a syringe (Bus. & Prof. Code, § 4140). The trial court found he had served a prior prison term (§ 667.5, subd. (b)) and had four strikes (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).) He was sentenced to prison for 25 years to life plus one year, with concurrent misdemeanor terms. We affirmed.

On March 15, 2014, defendant petitioned to recall his sentence under Proposition 36. The People opposed the petition, conceding defendant was eligible for consideration for resentencing, but arguing the trial court should exercise its discretion to find that defendant posed "an unreasonable risk of danger to public safety" (§ 1170.126, subd. (f)) and decline to resentence him. The People in part relied on a summary of defendant's criminal record and behavior while in custody.

---

[1] Further undesignated statutory references are to the Penal Code.

2

Certain prison disciplinary records were received into evidence without objection. Later, the trial court ordered the probation department to prepare a resentencing report. That report referenced an earlier report, which was later received into evidence.[2]

The trial court hearing focused on the question of dangerousness.[3] Defendant emphasized a risk assessment performed by the prison authorities that had concluded defendant was at low risk to reoffend, a conclusion rejected by the probation officer, purportedly without consideration of appropriate "evidence-based practices." Defense counsel conceded defendant was not a model inmate, but attributed that to the "despair that goes with a life sentence" and the environment at Pelican Bay State Prison, which included daily threats of violence among inmates. Counsel emphasized that defendant's last prison incident was five years old and was minor, involving pushing a food tray, and did not reflect dangerousness. In contrast, counsel argued defendant's local jail behavior had been problem-free. Further, an appropriate assessment should consider the fact that defendant was 51 years old, and his last violent offense occurred 15 years ago. His last firearms-related incident occurred 22 years ago. Defendant had access to a tribal support network if released under supervision in the community. A later report detailed defendant's plans as follows: He wanted Social Security benefits and a job with the Karuk Tribe's future casino, and planned to contact the tribe for a hotel voucher. He had a friend in a 12-step program who could be a resource for him.

---

[2] We note the original sentencing judge had retired and was unavailable.

[3] Had defendant been armed with a firearm, whether or not an arming enhancement had been pleaded, he would not have been eligible for resentencing. (See *People v. Quinones* (2014) 228 Cal.App.4th 1040, 1044-1045.) However, the jury acquitted defendant of possession of a firearm by a felon (former § 12021, subd. (a)(1)) (*Myers I, supra*, at p. 1) and the People conceded he was eligible for resentencing.

3

Amy Fernandez, the probation officer, testified she was aware of the prison's low risk assessment number for defendant. She had not been able to learn exactly how that number is derived, but thought it was designed to assess an inmate's in-prison risk. Another probation department employee used a risk-assessment protocol designed specifically to measure out-of-prison risk to evaluate defendant and concluded he was at high risk of violent reoffense. However, Fernandez was not completely confident in the accuracy of some of the information in that assessment, so the hearing was continued to allow her to prepare a new local assessment as well as to try to get more information about the way the prison assessed risk.

Fernandez's subsequent report included an updated local risk assessment that again concluded defendant was at high risk for violent reoffense. She had contacted the prison system and learned the prison-system's risk assessment protocol was essentially the same as the local one, in that it evaluated the risk of releasing someone on parole, and did not strictly address in-prison risk. She had sent the prison her assessment, and had sought an explanation for the discrepancy between the very different conclusions reached. The best she could determine was that the prison reached a lower score due to "defendant's length of incarceration coupled with his age," but she couched this as speculation on the part of the prison employee with whom she had spoken. She also did not find defendant's vague plans--relying on possible tribal assistance and a friend--to be viable in ameliorating defendant's risk to public safety.

After some delays, the hearing resumed on December 19, 2014, and Fernandez testified that, if released with a period of post-release community supervision (PRCS), defendant should have "some type of an anger management program" but she still felt he posed a risk to the community. During this hearing, the People conceded the general force of defense counsel's "aging out" argument, but maintained defendant individually presented a risk to the community, in part because he had failed to avail himself of rehabilitative services (such as counseling) while in prison.

4

The various probation reports reveal the following:  Defendant, born in 1963, had been removed from the home and made a ward at about age nine or 10, and had various placements during his formative years.  Defendant's father died when he was seven and his mother died in 1979; his older brother then cared for him.  He dropped out of school (either in the eighth grade or in high school), but had some vocational training in prison.  After two minor convictions, defendant was convicted of three counts of assault with a deadly weapon (strikes) in 1985, based on his use of a knife to wound three separate victims.  One victim required 65 stitches, and another was stabbed across one eye, had his ear cut in half, and had a lung punctured.  After a parole violation in 1990, defendant was convicted of unlawful possession of a firearm in 1992, violated parole in 1993, and was convicted of another strike in 1996, again based on his use of a knife.  In that same 1996 case, he was also convicted of battery on a correctional officer (§ 243.1), whom he struck on the cheek and then tried to choke.  While in prison, he again battered a custodial officer in 2009, by throwing a food tray through a port, striking the officer's feet.  He had numerous insubordination incidents in prison.

After taking the matter under submission, the trial court convened a final hearing on January 16, 2015.  The court found by a preponderance of the evidence that defendant would pose an unreasonable risk of danger to public safety if he were resentenced.  After describing defendant's lengthy criminal record and failure to reform his conduct, the trial court noted defendant's "strong propensity for violence and aggression unabated by rehabilitation and corrective efforts" while on probation or in prison.  The trial court did not give much weight to the fact the prison system deemed defendant to be at low risk of reoffense, attributing that to his age and length of his incarceration, and did not find those factors would ameliorate defendant's innate violent tendencies if freed from the structured prison environment.  Instead, the court found that defendant's "series of disciplinary difficulties [in prison] . . . showed a continuation of his angry, impulsive and potentially violent responses to the types of conflicts and confrontations that attends daily

5

life in any context [or] any setting." The trial court gave greater weight to the probation officer's more dire assessment of defendant's risk. The facts did not indicate any mental illness, but rather showed "defendant's long-standing, deeply imbedded character tendency toward angry, somewhat impulsive, violent acts" a trait which persisted in part because of defendant's lack of insight and failure to take responsibility for his behavior. Even assuming defendant's release were followed by PRCS, the court opined that defendant could not successfully engage such supervision in a way that would appreciably ameliorate the risk he presented to the community. Defendant had not presented a viable reentry plan, but had plans that were "somewhat vague and rather speculative at best and would seem somewhat ominously to involve returning him to much the same environment where he, in the past, repeatedly failed to avoid further criminality."

Accordingly, the trial court denied defendant's petition for resentencing.

Defendant timely appealed from the denial of his petition.[4]

## DISCUSSION

### I

*Standards for Determining Risk to Public Safety*

Defendant first contends the trial court used the incorrect standards to determine whether he posed an "unreasonable risk of danger to public safety" as that term is used in Proposition 36, the Three Strikes Reform Act of 2012. He cites Proposition 47, the Safe Neighborhoods and Schools Act passed on November 4, 2014, and effective before the trial court's January 2015 ruling in this case. (See *People v. Rivera* (2015) 233 Cal.App.4th 1085, 1089.) He argues that Proposition 47 defined the phrase

---

[4] On June 22, 2015, we granted appellant's "motion to construe notice of appeal as an appeal from an order after judgment affecting appellant's substantial rights" pursuant to section 1237, subdivision (b).

6

" 'unreasonable risk of danger to public safety' " in a narrower way, and applies to Proposition 36 (§ 1170.18, subd. (c)).

The People of this state recently passed two significant criminal reform measures, Proposition 36 in 2012, which ameliorated the Three Strikes Law by requiring the third strike to be a serious or violent felony (see *People v. Yearwood* (2013) 213 Cal.App.4th 161, 167-168 (*Yearwood*)), and Proposition 47 in 2014, which reduced a number of felony or wobbler offenses to misdemeanors (see *People v. Rivera*, *supra*, 233 Cal.App.4th at pp. 1090-1091).

Both initiatives contain procedures for current inmates to petition for resentencing, under guidelines designed to preclude relief for offenders deemed to present "an unreasonable risk of danger to public safety." (§§ 1170.126, subd. (f); 1170.18, subd. (c).) Proposition 36 did not define this key phrase, although it set forth the types of evidence the trial court could consider in applying the initiative, which gave trial courts broad discretion to determine what conduct an offender was likely to engage in that might threaten public safety. (§ 1170.126, subd. (g); see *People v. Garcia* (2014) 230 Cal.App.4th 763, 768-770; *People v. Flores* (2014) 227 Cal.App.4th 1070, 1075.) While Proposition 47 continued to allow the use of the exact same evidence a trial court could consider (§ 1170.18, subd. (b)), it also defined this phrase to specify that the public safety risk must be risk that the petitioner will commit a so-called "super-strike" (§ 1170.18, subd. (c); see § 667, subd. (e)(2)(C)(iv)).

In narrowing the definition of the risk to public safety, Proposition 47 provided that its definition would apply "throughout this Code." (§ 1170.18, subd. (c).) Such language plainly refers to the Penal Code as a whole. (See *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1255 [finding "nothing ambiguous about the phrase 'as used in this code' "]; *People v. Bucchierre* (1943) 57 Cal.App.2d 153, 166 ["The words 'as in this code provided' (Penal Code, § 182) refer to the Penal Code"].)

7

Thus, defendant plausibly and straightforwardly contends that Proposition 47 defined with precision the specific risk to public safety that would prevent resentencing, whether for a Proposition 47 petitioner or a Proposition 36 petitioner. Were we simply to hold the voters to the language they chose in adopting Proposition 47 and end our analysis here, we would agree with defendant. However, for reasons we explain, we do not end here.

We have a duty to construe the language of a statute or initiative by reconciling and harmonizing its parts, both internally and by considering its interaction with the larger body of connected laws. (See *People v. Pieters* (1991) 52 Cal.3d 894, 898-899; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) "We recognize the basic principle of statutory and constitutional construction which mandates that courts, in construing a measure, not undertake to rewrite its unambiguous language. [Citation.] That rule is not applied, however, when it appears clear that a word has been erroneously used, and a judicial correction will best carry out the intent of the adopting body." (*People v. Skinner* (1985) 39 Cal.3d 765, 775.) In some cases the text and purpose of a measure reveal a drafting error that must be corrected. (*Id.* at pp. 775-776.)

In this case, if the plain meaning of the relevant passage in question is followed, several inconsistencies both within Proposition 47 itself emerge, and several illogical effects emerge in the application of Proposition 36, which we detail *post*. Further, nowhere in any of the ballot materials presented to the voters who adopted Proposition 47 were any of these nuances mentioned. Indeed, other than the single use of the word "Code," there was *no* indication that Proposition 47 would have *any* effect on Proposition 36 at all. As we explain, all other indications were to the contrary.

In such circumstances, mindful of the healthy trepidation judges must feel when departing from the plain meaning of an enactment (see *Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1698-1699), we are compelled to conclude Proposition

8

47 contains a drafter's error.[5]  The phrase "throughout this Code" must be read to mean "throughout this act" to avoid illogical and unintended consequences.  (See *In re Thierry S.* (1977) 19 Cal.3d 727, 741, fn. 13 [mistaken statutory cross-reference disregarded to avoid "obvious absurdity"].)

We briefly detail our reasoning.

The People point to seven circumstances which they contend show the plain meaning of the statute would lead to absurd results.  Although we find some of these circumstances to be unhelpful or only weakly helpful, we agree that they combine to convincingly demonstrate that a drafter's error exists in Proposition 47.

First, the People point out that nothing in the title, summary, analysis, or arguments in the ballot pamphlet encompassing Proposition 47, suggested the measure would alter the effect or application of Proposition 36.  They partly rely on the notion that such an important change would not be made without comment.  (Cf. *In re Christian S.* (1994) 7 Cal.4th 768, 782 ["We are not persuaded the Legislature would have silently, or at best obscurely, decided so important and controversial a public policy matter"].)  Of course, the *text* of Proposition 47 was included in full in the ballot pamphlet.  (Voter Information Guide, Gen. Elec. (Nov. 4, 2014) text of Prop. 47, pp. 70-74.)  It is a longstanding rule that we must presume voters read and understood the *text* of ballot initiatives.  (See *Wright v. Jordan* (1923) 192 Cal. 704, 713 [voters "must be assumed to have voted intelligently upon an amendment to their organic law, the whole text of which was supplied each of them prior to the election, and which they must be assumed to have duly considered, regardless of any insufficient recitals in the instructions to voters or the

---

[5]  Another appellate court has reached the same conclusion--albeit employing different reasoning--over a dissent.  Our Supreme Court will ultimately resolve the issue.  (See *People v. Valencia* (2014) 232 Cal.App.4th 514, review granted Feb. 18, 2015, S223825.)

9

arguments *pro* and *con* of its advocates or opponents accompanying the text of the proposed measure"]; *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 252.)

The goal of Proposition 47 was to reduce the cost of housing petty criminals. This is shown by the argument in favor of Proposition 47, which spoke in terms of prioritizing serious and violent crime so as to stop wasting prison space "on petty crimes," stop "wasting money on warehousing people in prisons for nonviolent petty crimes," and stop California's overcrowded prisons from "incarcerating too many people convicted of low-level, nonviolent offenses." (Voter Information Guide, *supra*, argument in favor of Prop. 47, p. 38.) The rebuttal to argument against Proposition 47 reiterated these themes, and never suggested Proposition 47 would have any effect on resentencing under Proposition 36. Although the rebuttal lamented that many criminals with serious prior convictions would be released if the measure passed, there was no claim that any of those released early would be persons whose present crimes remained felonies. (See *id*., rebuttal to argument in favor of Prop. 47, pp. 38-39.) The same point is true of the discussion of resentencing contained in the argument against Proposition 47. (*Id*., argument against Prop. 47, p. 39.) Nowhere in the ballot materials were voters informed the law would also modify the resentencing provisions of Proposition 36, which concerns recidivist inmates serving sentences for felony offenses that remain classified as felonies. The official title and summary, legal analysis, and arguments for and against Proposition 47 are all silent on what effect--if any--Proposition 47 might or would have on Proposition 36. (See *id*. at pp. 34-39.)

Second, the People contend the two initiatives had very different purposes. In their view, Proposition 36 was designed "to restore the public's original understanding of the Three Strikes law by reserving life sentences for only the most dangerous criminals and defendants whose current conviction is for a serious or violent crime." In contrast, so the People argue, "the main purpose of Proposition 47 was to reprioritize spending and redirected it from the prison system into crime prevention, support programs in K-12

schools, victim services, and mental health and drug treatment." We agree in general. However, as the People concede, Proposition 36 also saves money, and Proposition 47 also addresses "aspects of public safety." Thus, both initiatives result in more lenient punishment for some offenders, with bulwarks against early release of more serious offenders, and both reduce the prison population and save money.

Third, the People argue the two initiatives have very different scopes. Proposition 36 benefits some persons with two or more strikes (serious felony convictions), whereas Proposition 47, generally speaking, benefits some persons who have committed petty felonies or wobblers that are to be reduced to misdemeanors. Admittedly, however, some people may be eligible to petition under both initiatives. The People summarize their contention as follows:

> "Although it is possible for an individual to be eligible for relief under both Proposition 36 and Proposition 47, the group targeted for relief under Proposition 47 as a whole is generally comprised of low-level offenders as opposed to the more volatile and recidivist serious and violent offenders Proposition 36 was designed to reach. There is a huge difference, both legally and in the risk to public safety, between someone with multiple [strikes] whose current offense is a felony, and someone with no felony criminal history whose current offense is (or would be, if committed today) a misdemeanor. Because the would-be misdemeanants who stand to benefit from Proposition 47, as a class, are less dangerous than recidivist felons with prior strike offenses, it is logical to impose a higher dangerousness standard for them (§ 1170.18, subd. (c)) than the standard applied for recidivist felons under Proposition 36."

We agree with the People that it would be *logical* to have two standards of dangerousness for the two classes of offenders seeking resentencing under the respective propositions. But that does not mean it is *absurd* to have the same standard of dangerousness "throughout this Code" as stated by Proposition 47. That would normally be a judgment within the competence of the electorate to make. If this uniform standard proves inexpedient, or is found to present an unwanted risk to public safety, the voters--or the Legislature, by a suitable majority--can change the rules.

11

Fourth, the People point to the close timing of the two measures, passed just two years apart, and the fact that the "window" for filing a resentencing petition under Proposition 36 expired just days before the adoption of Proposition 47.[6]  Their point is that when Proposition 47 took effect, only two days remained to file a Proposition 36 resentencing petition, absent good cause.  The People view the plain application of Proposition 47 to create a necessary extension of time to file Proposition 36 petitions, which in their view is absurd.  The new definition of unreasonable risk would apply to petitions, like defendant's herein, that had not yet been acted on by trial courts, and would also apply to so-called "late" petitions that were accompanied by a showing of good cause for the delay.  (§ 1170.126, subd. (b).)  We agree that it does seem unlikely that any rational voter would have intended to change the rules for Proposition 36 petitions at the last moment, when nearly all petitions would already have been filed and most of them had already been adjudicated.

Fifth, the People argue:  "The radical reduction of court discretion in Proposition 36 proceedings that would result without notice that the electorate intended to reduce the discretion it so recently and abundantly granted to the courts to determine a petitioner's dangerousness is also unreasonable."  This is partly an iteration of the claim that the ballot materials were silent on the precise question posed by this case.  To the extent the People contend a revision of a two-year-old initiative is necessarily unreasonable, we disagree.  The voters (by initiative) and the Legislature (by statute) frequently modify statutes after seeing their operation.  Here, the voters were presumptively aware that they were creating a new definition of "risk" that they wanted to be applicable "throughout this Code" which would include Proposition 36.  Applying that new definition would

---

[6]  The window for third-strike prisoners to seek resentencing closed "two years after the effective date" of Proposition 36 (i.e., November 7, 2012, the day after the election) except "upon a showing of good cause."  (§ 1170.126, subd. (b).)

result in the release of more prisoners, reducing prison overcrowding--the subject of notoriously protracted litigation (see, e.g., *Brown v. Plata* (2011) 563 U.S. 493 [179 L.Ed.2d 969])--and thereby saving the taxpayers' money. We see nothing unreasonable or absurd about the timing of the two initiatives per se.

In their sixth and seventh points, the most compelling of the series, the People make two strictly statutory arguments, that parts of Proposition 47 *itself* preclude the application of its definition of risk to Proposition 36 petitions. These two points together show the structure and content of section 1170.18 is inconsistent with the intent to apply the narrow definition of risk throughout the entire Penal Code. Perhaps most importantly, section 1170.18, subdivision (n) provides: "Nothing in this and related sections is intended to diminish or abrogate the finality of judgments in any case not falling within the purview of this act." Applying the newly narrowed definition of risk contained in section 1170.18, subdivision (c), would necessarily diminish or abrogate the finality of judgments in cases subject to Proposition 36, that do not fall within the purview of Proposition 47. Defendant's Proposition 36 petition seeks to abrogate the finality of a three strikes judgment in a case that does not involve a nonserious, nonviolent property or drug crime addressed by Proposition 47. Further, the wording of section 1170.18, subdivision (c) is itself inconsistent with the intent to apply it throughout the entire Penal Code. It refers to "petitioners" which, throughout Proposition 47, is a term referring to persons petitioning *under that act*. (See § 1170.18, subds. (a), (b), (c), (j), (*l*), & (m).) The narrow definition of risk defines a phrase that appears in only two sections of the Penal Code, sections 1170.18 (Proposition 47) and 1170.126 (Proposition 36). If the voters had intended to apply the newer Proposition 47 definition to all Proposition 36 petitions, it is difficult to imagine a more roundabout and illogical means of doing so.

13

Given consideration of the above points taken together, we conclude Proposition 47 contains a drafter's error, and the phrase "throughout this Code" must be read to mean "throughout this act." We do not reach this conclusion lightly, but in this particular situation, it is evident that the portion of the act at issue did not mean what it said. Accordingly, the trial court did not err by using the broader definition to determine whether defendant posed an unreasonable risk to public safety, and was not required to find he posed a risk of committing a "super strike" if he were to be resentenced.

II

*Abuse of Discretion*

Defendant contends that, assuming the trial court applied the correct legal standard of risk, the trial court abused its discretion. We disagree.

A trial court's sentencing decision will be upheld on appeal unless it " 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]." (*People v. Williams* (1998) 17 Cal.4th 148, 162.) It is the defendant's burden to demonstrate an abuse of discretion, not merely that different jurists might rationally disagree on the appropriate sentencing decision. (See *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977-978.) On appeal, defendant describes the evidence in the record as much as possible in his favor, but does little more than show that perhaps a different judge may have made a different determination. He does not come close to carrying his burden to show that *this* trial judge disregarded relevant evidence, failed to consider defendant's individual circumstances, or even came close to exceeding the bounds of reason.

Without addressing each of defendant's many subpoints, the record shows the trial court considered all of the information presented to it, and granted several continuances to allow the parties to gather more information. In particular, this included more information about the low-risk assessment by the prison authorities that differed so markedly from the local high-risk assessment. Ultimately, the trial court gave greater

14

weight to the local assessment, as it was entitled to do. The trial court also understood defendant could be subject to a period of PRCS if released, which can sometimes help reduce the risk of reoffense. However, the court found that this would not be effective in defendant's particular case, given defendant's longstanding criminality, defiance of authority, and vague plans for reintegration into society.

In short, we find no abuse of discretion on this record.

### III

### *Right to Jury Trial*

Defendant contends he had a Sixth Amendment right to a jury trial on the question whether he posed on undue risk to public safety. We disagree.[7]

Under Proposition 36, a defendant convicted of a felony with two or more prior strike allegations is subject to a sentence of 25 years to life if the current conviction is a serious or violent felony but is subject only to a two strike sentence if the current felony is not serious or violent. (See *People v. Yearwood*, *supra*, 213 Cal.App.4th at pp. 167-168.) Defendant contends that for a defendant who, like himself, is eligible for resentencing, Proposition 36 establishes the two strike sentence as the "mandatory minimum sentence" unless future danger to public safety is established. Citing *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435], and related authority, defendant contends he is entitled to a jury trial on the dangerous issue because a finding of danger effectively increases his punishment from the mandatory minimum.

This Sixth Amendment issue was resolved adversely to defendant in *People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279, as he concedes. We reject defendant's contention for the reasons stated therein. (*Kaulick*, at pp. 1301-1305.)

---

**7** Although defendant did not request a jury trial, the People do not contend this forfeits his claim that he was entitled to a jury trial.

15

## DISPOSITION

The order denying defendant's resentencing petition is affirmed.

/s/
Duarte, J.

We concur:

/s/
Hull, Acting P. J.

/s/
Hoch, J.

16