[No. G013837. Fourth Dist., Div. Three. July 20, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN MICHAEL BOUSER, Defendant and Appellant.

## COUNSEL

Stefanie A. Sada, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SONENSHINE, J.**—Following the denial of his Penal Code section 1538.5 motion, John Michael Bouser pleaded guilty to unlawfully possessing tar heroin (Health & Saf. Code, § 11350, subd. (a)). We find the heroin was legally seized and affirm the judgment.

I

One afternoon, Santa Ana Police Officer Brad Sadler saw Bouser in an alley known for drug dealing. Bouser was standing near a dumpster and appeared to be looking for something. When he saw Sadler, Bouser became nervous and began walking in the opposite direction.

Sadler stopped his patrol car approximately four feet behind Bouser. He then walked towards Bouser and asked him something like, "Hey, how you doing? You mind if we talk?" Sadler did not think he had sufficient cause to detain Bouser at this point. He simply wanted to investigate the situation. Bouser stopped and agreed to talk to the officer.

Sadler asked Bouser general information questions, such as his name, date of birth, and prior arrest history. He also asked Bouser what he was doing in the alley. Bouser said he had been visiting a friend in a nearby apartment complex, but he could not provide his friend's address. Sadler replied, "Well, if you've just been visiting the guy, why can't you give me his address?"

Sadler began filling out a field interview card, which is used to record personal information about a suspect. He was facing Bouser and about four to eight feet from the squad car. As was his standard procedure, Sadler then "ran a records check" from outside his car to determine whether Bouser had any outstanding warrants. Sadler initiated the check using code phrases and Bouser's name and date of birth. He did not tell Bouser he was running the check, but Bouser was close enough to hear Sadler.

For the next three to five minutes, Sadler made "small talk" with Bouser and finished filling out the field interview card. Sadler testified, "I don't recall having to tell him anything [while waiting on the check]. He was just standing right there. . . . The way I look at it is if somebody is not causing any problems, you don't . . . try to fix something that's not broken. He's just standing there, not causing me any problems. There's no reason to give him instructions."

When the records check revealed Bouser had an outstanding traffic warrant, Sadler arrested him and found tar heroin in his pants pocket. The whole incident took around 10 minutes, from the initial contact to Bouser's arrest.[1]

## II

Bouser contends he was seized for Fourth Amendment purposes when Sadler ran the warrant check. He claims, "It is inconceivable the average person would feel free to leave once he [or she] knew a police officer was attempting to obtain information about outstanding warrants." At that point, Bouser argues, the officer has conveyed suspicion to the suspect such that he or she would not feel free to depart. Bouser also asserts his seizure was illegal for want of reasonable suspicion he was involved in criminal activity. The Attorney General impliedly concedes Sadler lacked reasonable suspicion. But the state maintains the contact never ripened into a seizure until Bouser's formal arrest.

"[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." (*Florida* v. *Bostick* (1991) 501 U.S. 429, 439 [115 L.Ed.2d 389, 401-402, 111 S.Ct. 2382]; see also *California* v. *Hodari D.* (1991) 499 U.S. 621, 628 [113 L.Ed.2d 690, 698-699, 111 S.Ct. 1547] [seizure occurs when officers convey message suspect is not free to disregard the police]; *United States* v. *Mendenhall* (1980) 446 U.S. 544, 554 [64 L.Ed.2d 497, 509, 100 S.Ct. 1870] (plur. opn. of Stewart, J.) [test for seizure is whether "a reasonable person would have believed that he [or she] was not free to leave"]; *Terry* v. *Ohio* (1968) 392 U.S. 1, 19, fn. 16 [20 L.Ed.2d 889, 905, 88 S.Ct. 1868] [restraint of liberty by physical force or show of authority constitutes seizure].)

In *Bostick*, two police officers, one of whom was armed, boarded a bus during a stopover as part of a routine drug interdiction program. Without articulable suspicion, they asked to see, and inspected, the defendant's ticket and identification. Although the items checked out, the officers told the defendant they were narcotics agents and requested to see his luggage. At that point, the defendant consented to a search, which revealed contraband in one of his bags.

---

[1]Bouser testified Sadler patted him down and directed him into the police car before the records check was completed. However, the magistrate found "the credibility of the officer is substantially greater than the defendant" and impliedly rejected Bouser's testimony.

In finding a seizure under these facts, the Florida Supreme Court adopted a per se rule prohibiting the police from randomly boarding buses to find and confiscate drugs. (*Florida* v. *Bostick, supra,* 501 U.S. at p. 435 [115 L.Ed.2d at pp. 397, 399].) However, the United States Supreme Court determined the location of the encounter is but a single factor in the seizure analysis. (*Id.* at p. 437 [115 L.Ed.2d at p. 400].) The matter was thus remanded for the state court to consider the totality of the circumstances in deciding the legality of the officers' actions. (*Ibid.*) While not deciding the issue, the high court was skeptical a seizure had occurred, emphasizing the officers did not point guns at the defendant or otherwise threaten him. (*Ibid.*) The court also instructed "that police officers can approach individuals as to whom they have no reasonable suspicion and ask them potentially incriminating questions" without implicating the Fourth Amendment. (*Id.* at p. 439 [115 L.Ed.2d at p. 401].)

 That is essentially what happened at the outset in this case. After Bouser agreed to talk, Sadler obtained identification information from him and asked what he was doing in the alley. Standing alone, this did not implicate the Fourth Amendment. (See *Florida* v. *Royer* (1983) 460 U.S. 491, 501 [75 L.Ed.2d 229, 238-239, 103 S.Ct. 1319] (plur. opn. of White, J.); *United States* v. *Mendenhall, supra,* 446 U.S. at p. 555 [64 L.Ed.2d at pp. 509-510]; *People* v. *Lopez* (1989) 212 Cal.App.3d 289 [260 Cal.Rptr. 641]; cf. *Wilson* v. *Superior Court* (1983) 34 Cal.3d 777 [195 Cal.Rptr. 671, 670 P.2d 325] [officer's identifying himself as narcotics investigator and conveying suspicion defendant was carrying drugs constituted seizure].) The more difficult question, however, is whether the consensual encounter became a seizure when Sadler commenced the warrant check over the radio.

*United States* v. *Analla* (4th Cir. 1992) 975 F.2d 119 is instructive on the issue. In that case, officers approached Analla while he was at a phone booth and asked to see his license and registration. Analla acquiesced and waited with the officers while one of them checked the license over the radio. During the check, another officer arrived and advised Analla he fit the description of a murder suspect. Analla then consented to a search of his car, which led to the recovery of the murder weapon and other incriminating evidence.

Analla argued the search was tainted because he was unlawfully seized when he consented. However, the court disagreed: "When officer Parker approached Analla and asked to see his license and registration, Analla was not seized. Analla's cooperation with Parker did not convert the encounter into a seizure, even though Parker did not tell Analla that he was free to leave or to refuse the request. Although Parker was accompanied by officer

McCoy, neither had his gun drawn. There is no evidence of any use or threat of physical force, and, although Analla claims that the officers' tone of voice was intimidating, the district court found to the contrary. Parker necessarily had to keep Analla's license and registration for a short time in order to check it with the dispatcher. However, he did not take the license into his squad car, but instead stood beside the car, near where Analla was standing, and used his walkie-talkie. Analla was free at this point to request that his license and registration be returned and to leave the scene." (*United States* v. *Analla, supra,* 975 F.2d at p. 124.)

The recent case of *Wilson* v. *State* (Wyo. 1994) 874 P.2d 215 is also on point. There, an officer pulled up to Wilson to offer assistance when he saw him limping on a sidewalk in the early morning hours. Smelling alcohol on his breath, the officer requested identification from Wilson and radioed "a routine warrants check with the National Crime Information Center (NCIC) and local files." (*Id.* at p. 217.) The officer then went to check on a nearby fire, telling Wilson to "stay in the area." (*Ibid.*) However, by the time the officer returned eight minutes later, Wilson had limped forty feet away and was attempting to cross the street. The officer helped Wilson do so and then told him to wait on the corner until he returned. Moments later, the officer arrested Wilson on two outstanding warrants, and Wilson later implicated himself in starting the fire.

In assessing whether Wilson's arrest and confession were the fruits of an illegal stop, the Wyoming Supreme Court analyzed the facts chronologically. It found the initial encounter was not a detention, having "occurred in a consensual atmosphere" without the officer using his flashing lights or siren to signal Wilson to halt. (*Wilson* v. *State, supra,* 874 P.2d at p. 221.) The "encounter remained consensual," in the court's view, when the officer requested identification and Wilson complied. (*Id.* at p. 222.)[2] Furthermore, the contact did not lose its consensual nature after the officer initiated the warrants check, because the officer "had not imposed any restriction on Wilson's freedom to leave as the warrants check was instituted." (*Ibid.*) It was only after the officer told Wilson to "stay in the area" and wait on the street corner that the encounter potentially ripened into a seizure. (*Id.* at p. 223.)[3] At that point, the court determined, holding Wilson without an articulable suspicion of criminal activity pending completion of the warrant check violated the Fourth Amendment. (*Id.* at pp. 224-225.) In other words,

[2]The court noted the record did not disclose whether the officer retained Wilson's identification or immediately returned it to him. (*Wilson* v. *State, supra,* 874 P.2d at p. 222.)

[3]The court said the officer's telling Wilson to "stay in the area" might have constituted a seizure had Wilson actually yielded (see *California* v. *Hodari D., supra,* 499 U.S. 621) and that a seizure did occur when Wilson complied with the instruction to wait on the street corner. (*Wilson* v. *State, supra,* 874 P.2d at p. 223.)

commencing a warrant check does not constitute a seizure per se but *detaining* a person without cause until a warrant check is completed is illegal. (Accord, *State* v. *Deitman* (Utah 1987) 739 P.2d 616 [no seizure found where defendants agreed to speak with police, produced identification, and were not held against their will during warrant check]; *People* v. *Miller* (1989) 149 A.D.2d 538 [539 N.Y.S.2d 809, 811] [temporarily holding defendant pending warrant check "never escalated to the level of a forcible stop."]; *State* v. *Johnson* (1986) 34 Ohio App.3d 94 [517 N.E.2d 262] [request for identification and "routine warrant check" did not constitute seizure where police neither drew their guns nor ordered defendant to do anything].)

The factually intensive nature of the seizure inquiry is further illustrated by *State* v. *Painter* (1984) 296 Ore. 422 [676 P.2d 309]. In *Painter*, the Oregon Supreme Court found a detention occurred when the police approached the defendant, requested identification, and retained his license and credit cards while running a radio check. (*Id.*, 676 P.2d at pp. 311-312.) Retention of the defendant's identification materials was the key factor, because, as the court put it, "Defendant was, in fact, *unable* to leave [without them]." (*Id.* at p. 311, italics added; see also *Florida* v. *Royer, supra*, 460 U.S. at p. 501 [75 L.Ed.2d at pp. 238-239] [seizure found where police retained defendant's airport ticket and identification during questioning].)

That appears to be the rationale behind the Oregon Court of Appeals opinion in *State* v. *Smith* (1984) 73 Ore.App. 287 [698 P.2d 973], which arose from the police contacting the defendant and his companion in a park. Smith produced a food stamp card during the contact which the officers used to run a radio warrant check.[4] In the few minutes it took for the check, the defendant made incriminating statements related to narcotics possession. "[W]hether the warrant check transformed the encounter from mere conversation into a stop" under Oregon law was the pivotal legal question for the court.[5] In deciding it did, the court stated "the use of defendant's identification to check for arrest warrants constituted a show of authority that would lead a reasonable citizen in defendant's circumstances to believe that he was not free to leave unless the warrant check came back clear." (*Id.* at p. 976.)

To the extent *Smith* holds commencing a warrant check on a suspect automatically converts a consensual encounter into a Fourth Amendment

---

[4] The opinion does not state whether the officers retained defendant's card during the check.

[5] The controlling Oregon statute was patterned after *Terry* v. *Ohio, supra*, 392 U.S. 1 and defined a "stop" as "a temporary restraint of a person's liberty by a peace officer lawfully present in any place." (*State* v. *Smith, supra*, 698 P.2d at p. 975, fn. 2.) The court relied on state and federal decisions in deciding whether a stop occurred under the statute. (*Ibid.*)

seizure, we believe it is inconsistent with the United States Supreme Court's more recent ruling in Bostick, *supra*, which requires courts to assess the totality of the circumstances in determining whether a seizure has occurred. *Smith* also goes beyond the holding in *Barber* v. *Superior Court* (1973) 30 Cal.App.3d 326 [106 Cal.Rptr. 304].

In *Barber*, the officer pulled behind a car parked on the side of the road and approached the sleeping occupants to check on their well being. Despite Barber's assurance everything was all right, the officer solicited identification from him as other officers arrived on the scene. The officer then informed Barber he was running a warrant check and told him he could wait in his car. When the check came back positive, the officer arrested Barber and found incriminating evidence in his vehicle.

In finding the officer's actions illegal, the *Barber* court focused on the lack of evidence of any wrongdoing by Barber and his sleeping family. (*Barber* v. *Superior Court, supra*, 30 Cal.App.3d at pp. 329-330.) It did not expressly consider whether Barber was seized during the contact. Instead, the court assumed Barber was seized when the officer said he could wait in his car pending the warrant check. (*Id.* at p. 330.) That the court considered Barber seized before the warrant check is evidenced by the court's warning: "Officers are not at liberty to stop, intrude upon and detain individuals they happen to come upon to determine if there are warrants outstanding against them." (*Ibid.*) In this regard, *Barber* is consistent with *Wilson, supra*, in that it prohibits detentions for the sole purpose of running a warrant check. However, neither opinion is authority for the proposition that a warrant check automatically transforms an otherwise consensual police contact into a seizure.

Indeed, we refuse to adopt such a bright line rule in the present case. Rather, we consider Officer Sadler's warrant check a single circumstance that must be viewed in light of the other facts presented. Sadler testified he initiated the check using Bouser's name, birthdate, and certain code phrases. Most people do not know the exact meaning of such a check. Nonetheless, it is reasonable to presume the check alerted Bouser he was somehow being investigated. Coupled with Sadler's questioning, Bouser reasonably may have felt the subject of general suspicion at this time. Significantly, however, neither the questioning nor the warrant check related to specific and identifiable criminal activity. Moreover, Sadler did not order Bouser to do anything or turn over anything to him to hold while the brief check was completed. Nor did Sadler draw his weapon, make any threatening gestures, or utilize his car's lights or siren.

██ "The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation." (*Florida* v. *Bostick*,

*supra,* 501 U.S. at p. 439 [115 L.Ed.2d at p. 401].) Because Bouser was free to terminate the encounter at any point up to his arrest, his Penal Code section 1538.5 suppression motion was properly denied.

The judgment is affirmed.

Sills, P. J., concurred.

**CROSBY, J.,** Dissenting.—Yossarian[1] would not be surprised. If an individual does not submit to a legally unprovoked show of police authority, the United States Supreme Court tells us there is no seizure until the person is physically brought to a halt. (*California* v. *Hodari D.* (1991) 499 U.S. 621 [113 L.Ed.2d 690, 111 S.Ct. 1547].) But if the individual does submit, there still is no seizure in most instances, according to the court. (*INS* v. *Delgado* (1984) 466 U.S. 210 [80 L.Ed.2d 247, 104 S.Ct. 1758].) This paradox is explained by the court's continuing indulgence in the fiction that a citizen's submission to police questioning and demand for production of identification (or identifying information) does not amount to a seizure.[2]

Indeed, the court permits use of this fiction even in situations where the individual is concededly not free to leave. In *Delgado* immigration agents interrogated people at work, and in *Florida* v. *Bostick* (1991) 501 U.S. 429 [115 L.Ed.2d 389, 111 S.Ct. 2382] narcotics officers questioned bus passengers.[3] Neither group was free to leave; but the Supreme Court dismissed that

---

[1]Heller, Catch 22 (1961).

[2]One might persuasively argue the Supreme Court's assumption that the police will honor an individual's wish to depart is naive. (See *Brown* v. *Texas* (1979) 443 U.S. 47 [61 L.Ed.2d 357, 99 S.Ct. 2637]; *People* v. *Lopez* (1989) 212 Cal.App.3d 278, 294 [260 Cal.Rptr. 641] (conc. opn. of Crosby, J.); *People* v. *Contreras* (1989) 210 Cal.App.3d 450, 452 [258 Cal.Rptr. 361].) Cases such as *California* v. *Hodari D.,* supra, 499 U.S. 621, where police have not conformed to the court's genteel expectations, support that view.

Five years ago I noted, "Among the most fundamental of the liberties enjoyed by members of a free and open society is the right to be left alone. Allowing police to demand identification without reasonable suspicion in ordinary street encounters and requiring those who would assert their rights to resist the police as the price of their freedom is unsound as a matter of constitutional law and sends exactly the wrong message to the citizenry. That message is: You are protected by the Fourth Amendment only to the extent you are willing to risk the physical violation of your person by armed officers. In accord with Justice Brennan, I believe we can do much better than that." (*People* v. *Lopez,* supra, 212 Cal.App.3d at p. 294 (conc. opn. of Crosby, J.).)

[3]In *Bostick* the officers told the defendant he did not have to submit to a search, but not that he was free to leave. Similarly, Bouser was not told he was free to refuse to provide the information demanded for the field identification card or to leave before the warrant check was completed.

problem in each instance because, although the officers obviously took advantage of the situations, they did not create them.[4]

Here, of course, if a reasonable person would not feel free to leave, Officer Sadler would be responsible for that. And I doubt a reasonable person in Bouser's circumstances would believe the officer would allow him to leave. Defendant behaved as if he did not wish to deal with the police. He was nervous and walked briskly away from Sadler at the outset.[5] Still, he could not shake the officer.

Defendant only stopped when he was approached by the patrol car and hailed. He was then held for 10 minutes and interrogated while the officer completed a field identification card and ran a warrant check. No rational person could mistake what Sadler was doing when he called in Bouser's name and birthdate on his hand-held radio: He was conducting what amounted to a criminal investigation. Not many people would conclude one could simply wander off before the warrant-checking process was completed. (See *Wilson* v. *Superior Court* (1983) 34 Cal.3d 777, 790-791 [195 Cal.Rptr. 671, 670 P.2d 325].) The ordinary honest sort would consider that poor citizenship at best, illegal at worst; an experienced street person would know it would probably only aggravate a deteriorating situation and might have unpleasant physical consequences.

The majority's painful effort to justify its result by resort to other state and circuit court cases misses the point. Under the guidance of the state and federal Supreme Courts, it is our job to determine whether a reasonable person would feel free to leave under the facts found by the lower court, i.e., in this case the officer's version. What other judges on the planet may have done with similar questions is interesting, perhaps; but we may not abdicate our responsibility to them.

---

[4]This reasoning is highly suspect, I think. People who are trapped, for whatever reason, are simply not free to go. And the question is whether they consent to the police intrusion in their lives, not who created the captive audience opportunity in the first place. At any given time, perhaps a majority of the population can be found to be in places they cannot depart (at least as a practical matter): They would include most people at work; inmates of hospitals, jails, prisons, and other institutions; students; military personnel; and travelers on ships, planes, trains, and buses.

[5]Sadler claimed he would not have chased Bouser had he chosen to run. But he several times conceded that defendant did not want to have anything to do with him: "[Defendant] appeared to be trying to intentionally not notice me until I made verbal contact with him." Sadler was then asked, "So you felt prior to your making a verbal contact that he was doing whatever he could to avoid having contact with you; is that correct?" The officer responded, "Yes, I did, sir." Later he testified, "I believed he was not happy to see me and did not and was a little bit uptight about my presence and probably did not really want to come up and start talking to me. But I left that option up to him when I asked him if he minded if we talked."

We reviewed a similar street encounter in *People* v. *Lopez, supra,* 212 Cal.App.3d 289. But there the defendant displayed no initial unwillingness to be contacted, the questioning was brief and somewhat lighthearted, no field identification card was employed, no warrant check was run, and the officers had only just requested identification when a bindle of cocaine popped out of Lopez's wallet. *That* was a close case. This one is not. This was no consensual encounter under the cases binding on us (e.g., *Florida* v. *Royer* (1983) 460 U.S. 491 [75 L.Ed.2d 229, 103 S.Ct. 1319]; *Wilson* v. *Superior Court, supra,* 34 Cal.3d 777); it was a detention—and an unlawful one because the officer admittedly had no reasonable suspicion of criminal activity. I would reverse with directions to grant the motion to suppress.

A petition for a rehearing was denied August 5, 1994. Crosby, J., was of the opinion that the petition should be granted. Appellant's petition for review by the Supreme Court was denied November 3, 1994.