Filed 8/16/16  P. v. Chavarin CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROSALIO CHAVARIN,<br><br>    Defendant and Appellant. | H041443<br>(Monterey County<br>Super. Ct. No. SS141243) |

Following the denial of his motion to suppress, defendant Rosalio Chavarin pleaded no contest to a violation of former Health and Safety Code section 11377, subdivision (a), (possession of methamphetamine) pursuant to a negotiated plea agreement.  The court sentenced defendant, suspended the sentence, and placed defendant on probation.

In 2014, after defendant was granted probation, the California voters enacted Proposition 47, the Safe Neighborhoods and Schools Act (the Safe Neighborhoods Act), which went into effect on November 5, 2014.  (See Voter Information Guide, Gen. Elec. (Nov. 4, 2014), text of Prop. 47; Cal. Const., art. II, § 10.)  The Safe Neighborhoods Act amended Health and Safety Code section 11377.  (Voter Information Guide, *supra*, text of Prop. 47, § 13.)  Under the amended section, a violation of its subdivision (a), previously a so-called wobbler (see Stats. 2011, ch. 15, § 171, p. 325; see Pen. Code, § 17),[1] generally is a misdemeanor offense except when committed by persons previously

_____

[1] All further statutory references are to the Penal Code unless otherwise specified.

convicted of certain offenses.[2]  Defendant represents, and the People have not disputed, that he has no disqualifying convictions that would prevent his conviction from being punished as a misdemeanor.

On appeal from the judgment of conviction, defendant challenges the court's ruling on his suppression motion.  Defendant also asserts that the rule of *Estrada* (*In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*)) requires the ameliorative provisions of the Safe Neighborhoods Act to be retroactively applied to him because the judgment was not final on the proposition's effective date.

We conclude that the trial court correctly denied defendant's motion to suppress and the *Estrada* rule does not apply.  Accordingly, we affirm the judgment.

## I

### *Procedural History*

An information, filed July 14, 2014, charged defendant with unlawfully possessing a controlled substance (methamphetamine) on or about May 18, 2014 in violation of former Health and Safety Code section 11377, subdivision (a).

---

[2] As amended by the Safe Neighborhoods Act, Health and Safety Code section 11377, subdivision (a), provides:  "Except as authorized by law and as otherwise provided in subdivision (b) or Section 11375, or in Article 7 (commencing with Section 4211) of Chapter 9 of Division 2 of the Business and Professions Code, every person who possesses any controlled substance which is (1) classified in Schedule III, IV, or V, and which is not a narcotic drug, (2) specified in subdivision (d) of Section 11054, except paragraphs (13), (14), (15), and (20) of subdivision (d), (3) specified in paragraph (11) of subdivision (c) of Section 11056, (4) specified in paragraph (2) or (3) of subdivision (f) of Section 11054, or (5) specified in subdivision (d), (e), or (f) of Section 11055, unless upon the prescription of a physician, dentist, podiatrist, or veterinarian, licensed to practice in this state, shall be punished by imprisonment in a county jail for a period of not more than one year, except that such person may instead be punished pursuant to subdivision (h) of Section 1170 of the Penal Code if that person has one or more prior convictions for an offense specified in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 of the Penal Code or for an offense requiring registration pursuant to subdivision (c) of Section 290 of the Penal Code."

2

Defendant filed a renewed motion to suppress evidence pursuant to section 1538.5, subdivision (i). Defendant relied upon only the transcript of the preliminary hearing. The trial court concluded that the initial encounter was consensual, finding that defendant remained on his bike, he was not handcuffed, and he was free to discontinue the conversation and continue on his way. The court denied defendant's motion to suppress.

After the trial court denied his suppression motion, defendant pleaded no contest to possession of methamphetamine as charged (former Health & Saf. Code, § 11377, subd. (a)) in exchange for an agreed-upon disposition. The court sentenced him to an eight-month term consecutive to a four-year term imposed, execution of which was suspended, in another case (case No. SS130102A); it suspended execution of the sentence; and it placed defendant on probation under certain terms and conditions.

## II

### *Discussion*

A. *Motion to Suppress*

1. *Factual Background*

At approximately 4:41 p.m. on May 18, 2014, Don Hart and Robert Miller, police officers employed by the City of Salinas, were on duty in the area of 1185 Monroe Street in the City of Salinas. They were in a marked patrol vehicle, and Officer Miller was driving southbound on Monroe Street at 15 to 20 miles per hour. The officers were in uniform, and they were wearing their black tactical or raid vests. Both officers were armed and had tasers.

The officers noticed two individuals coming out of an apartment complex located at 1185 Monroe Street. A male was on a bike and a female was walking next to him. Officer Miller recognized defendant from prior contacts, and he knew from a recent BOL ("be on the lookout") that defendant was wanted. Officer Miller told Officer Hart that he recognized one of the individuals, and he pulled the vehicle alongside the curb.

3

Officer Hart exited the vehicle and approached defendant, who was on the immediately adjacent sidewalk. There were no additional officers or patrol vehicles in the vicinity.

Officer Hart made contact with defendant, who remained on his bicycle. Officer Hart was standing about five feet from defendant while he was speaking to him. Officer Miller got out of the vehicle and walked to the curb line; he stayed there during Officer Hart's exchange with defendant. Officer Miller had a hand pack radio with an ear piece; he conducted a records check on defendant.

The first thing Officer Hart said to defendant was "What's your name?" Defendant responded by giving Officer Hart his true name, Rosalio Chavarin. Officer also asked the woman, who was standing just to the left of defendant, her name. Officer Hart asked defendant whether he was on probation or parole. Defendant disclosed that he was on probation for possession of a firearm. After this disclosure, which Officer Hart found unsettling, Officer Hart asked defendant for permission to search him for weapons. Defendant said, "Go ahead." Officer Hart conducted a cursory pat search of defendant's outer clothing for weapons. He found no weapons.

Over their ear pieces, both officers heard a radio advisement from the Salinas Police Department's records division that defendant possibly had an outstanding felony warrant for his arrest. At this point, approximately a couple of minutes had elapsed since Officer Hart had exited his vehicle and approached defendant. Defendant was still seated on his bicycle.

Officer Hart then asked defendant and his companion to sit on the curb; defendant complied. Officer Miller sought confirmation of the possible warrant from the office of the Monterey County Sheriff. Approximately two minutes after Officer Hart had asked defendant and his companion to have a seat on the curb, the "warrants division" confirmed by radio that there was, in fact, an outstanding no-bail, felony warrant for defendant's arrest. The total time elapsing between the patrol vehicle pulling over to the

curb and the second radio confirmation was three to four minutes. It usually took one to two minutes to receive a return to a records check.

Officer Hart asked defendant, who was seated on the curb, to place both hands behind his back. Defendant complied, and Officer Hart handcuffed him.

After handcuffing defendant, Officer Hart then asked defendant to stand up, and the officer walked defendant to the patrol vehicle, where the officer conducted a search incident to arrest. Officer Hart found a small plastic baggie of a substance that he suspected was methamphetamine in defendant's rear pants pocket. It was packaged in clear plastic. The officer placed defendant in the back of the patrol vehicle.

Officer Hart handed the suspected methamphetamine to Officer Miller. Officer Miller recognized the substance as methamphetamine based on his training and experience.

A test later performed by Officer Miller yield a presumptive positive result for the presence of methamphetamine. The substance had a total net weight of one-tenth of a gram (.1 grams), which in Officer Miller's opinion constituted "a typical usable amount for an average user."

2. *Analysis*

a. *Standard of Review*

" 'Our review of issues related to the suppression of evidence seized by the police is governed by federal constitutional standards.' (*People v. Lenart* (2004) 32 Cal.4th 1107, 1118; see Cal. Const., art. I, § 28, subd. (f)(2).)" (*Robey v. Superior Court* (2013) 56 Cal.4th 1218, 1223.) "When considering a trial court's denial of a suppression motion, 'we view the record in the light most favorable to the trial court's ruling, deferring to those express or implied findings of fact supported by substantial evidence.' [Citations.] We independently review the trial court's application of the law to the facts. [Citations.]" (*People v. Davis* (2005) 36 Cal.4th 510, 528-529; see *People v. Tully* (2012) 54 Cal.4th 952, 979.)

b. *No Unlawful Detention*

Defendant asserts that the officers' initial contact with him constituted a detention that was not justified by reasonable suspicion of criminal activity. He contends that he was "immediately detained when the officers abruptly stopped their patrol vehicle and jumped out demanding [his] identity." Defendant further argues that the officers engaged in "a show of authority so intimidating" that it effectively communicated to him that he was not free to decline Officer Hart's requests or otherwise terminate the encounter. He maintains that the methamphetamine discovered on his person incident to arrest should have been suppressed as "fruit of the poisonous tree," i.e., the result of the allegedly unlawful detention.

The principal issue presented in this appeal is whether the encounter between the officers and defendant began as a consensual encounter or an unlawful detention.[3] "Under the Fourth Amendment, [the United States Supreme Court has] held, a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.' [Citation.] '[T]he stop and inquiry must be "reasonably related in scope to the justification for their initiation." ' [Citation.] Typically, this means that the officer

---

[3] The People did not argue that the BOL bulletin gave rise to reasonable suspicion that there was an outstanding felony arrest warrant for defendant's arrest, which justified a detention to confirm the warrant. "[I]f a [law enforcement] flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification [citations], to pose questions to the person, or to detain the person briefly while attempting to obtain further information. [Citation.]" (*United States v. Hensley* (1985) 469 U.S. 221, 232 (*Hensley*).) But "[i]f the flyer [or bulletin] has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." (*Ibid.*) There was no evidence regarding the basis for issuing the BOL bulletin.

may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.  But the detainee is not obliged to respond.  And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." (*Berkemer v. McCarty* (1984) 468 U.S. 420, 439-340, fns. omitted.)  "A detention occurs when the officer, by means of force or show of authority, has restrained a person's liberty.  (*Terry v. Ohio* (1968) 392 U.S. 1, 19, fn. 16.)  Unlike a consensual encounter, a detention must be supported by reasonable suspicion the person is involved in criminal activity.  (*People v. Souza* (1994) 9 Cal.4th 224, 231.)" (*People v. Zaragoza* (2016) 1 Cal.5th 21, 56.)

In the seminal case of *Terry v. Ohio*, *supra*, 392 U.S. 1 (*Terry*), the Supreme Court stated:  "[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." (*Id.* at p. 20, fn. 16.)  In his concurring opinion, Justice White observed:  "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets.  Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way." (*Id.* at p. 34 (conc. opn. of White, J.).)

The United States Supreme Court later elaborated:  "[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. . . .  The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'  *United States v. Martinez-Fuerte* [(1976)] 428 U.S. 543, 554.  As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." (*United States v. Mendenhall* (1980)

446 U.S. 544, 553-554 (*Mendenhall*); see *Florida v. Royer* (1983) 460 U.S. 491, 497 (plur. opn. of White, J.) (*Royer*) ["law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place" or "by putting questions to him if the person is willing to listen"].)

"Consensual encounters [between police officers and individuals] require no articulable suspicion of criminal activity. [Citations.]" (*People v. Rivera* (2007) 41 Cal.4th 304, 309.) The fact that the questioner was a law enforcement official is not enough, in itself, to establish a seizure. (*Mendenhall*, *supra*, 446 U.S. at p. 555; see *Royer*, *supra*, 460 U.S. at pp. 497-498 ["[T]he fact that the officer identifies himself as a police officer" does not, "without more, convert the encounter into a seizure requiring some level of objective justification. [Citation.]".) The fact that officers do not tell a person with whom they have an encounter that the person is "free to decline to cooperate with their inquiry" does not determine whether the person voluntarily responded. (*Mendenhall*, *supra*, at p. 555.)

"Officers are often required to wear uniforms and in many circumstances this is cause for assurance, not discomfort. Much the same can be said for wearing sidearms. That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." (*United States v. Drayton* (2002) 536 U.S. 194, 204-205 (*Drayton*).)

"In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment." (*Hiibel v. Sixth Judicial Dist. Court of Nev.*, *Humboldt Cty*. (2004) 542 U.S. 177, 185.) "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means. [Citation.]" (*Drayton*, *supra*, 536 U.S. at p. 201.)

8

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See *Terry v. Ohio*, *supra*, 392 U.S., at 19, n. 16; *Dunaway v. New York*, 442 U.S. 200, 207, and n. 6; 3 W. LaFave, Search and Seizure 53-55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." (*Mendenhall*, *supra*, 446 U.S. at pp. 554-555, fn. omitted.)

"[T]he 'reasonable person' test presupposes an *innocent* person. [Citations.]" (*Florida v. Bostick* (1991) 501 U.S. 429, 438 (*Bostick*).) "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." (*Michigan v. Chesternut* (1988) 486 U.S. 567, 573.) "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Cf. *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 231-234. Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." (*INS v. Delgado* (1984) 466 U.S. 210, 216 (*Delgado*).)

"If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed." (*Royer*, *supra*, 460 U.S. at p. 498.) "Consensual encounters do not trigger Fourth Amendment scrutiny.

9

(*Florida v. Bostick* (1991) 501 U.S. 429, 434.) Unlike detentions, they require no articulable suspicion that the person has committed or is about to commit a crime. (*Wilson v. Superior Court* [(1983)] 34 Cal.3d [777,] 784.)" (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.) Of course, "an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' [Citations.]" (*Delgado*, *supra*, 466 U.S. at p. 215.)

Defendant fails to describe the factual record in the light most favorable to the trial court's ruling. His description of the encounter with the officers exaggerates its coercive nature. Defendant claims that the officers' marked patrol vehicle abruptly pulled to the curb, the officers jumped out, and Officer Hart immediately demanded that defendant identify himself. According to defendant, "Officer Miller took an aggressive position, providing cover to Officer Hart." Defendant claims that he "had no choice but to stop and acquiesce" to the officers' demands.

We first note that the "free to leave" test is *not* subjective, and therefore it is irrelevant whether or not defendant felt free to leave. The encounter in this case took place on a public street in daylight. Officer Miller did not flash the patrol vehicle's lights or turn on its siren when he pulled to the curb. There was no evidence that the vehicle suddenly veered to the curb or that the officers aggressively leaped from it. The officers did not draw or brandish their weapons. There was no evidence that the officers used intimidating words, tones of voice, or body language. Officer Miller stood back at the curb while Officer Hart spoke with defendant. There were two civilians and two officers. While Officer Hart asked for certain information, his inquiries were in the form of questions, not commands. Before defendant was arrested, Officer Miller did not physically touch defendant, and Officer Hart touched defendant with his permission in order to conduct a cursory, consensual pat search for weapons.

10

The facts of this case are not analogous to the circumstances in *People v. Garry* (2007) 156 Cal.App.4th 1100 (*Garry*) as argued by defendant. In *Garry*, a police officer, who was patrolling "a high-crime, high-drug area" late at night, turned on his patrol vehicle's spotlight, illuminating the defendant. (*Id.* at pp. 1103-1104.) The evidence indicated that the officer, "immediately after spotlighting [the] defendant, all but ran directly at him, covering 35 feet in just two and one-half to three seconds, asking [the] defendant about his legal status as he did so." (*Id.* at p. 1112.) During that approach, the defendant indicated that he lived " 'right there' and took three or four steps back . . . ." (*Id.* at p. 1104.) The defendant answered that he was on parole in response to the officer's question, "Are you on probation or parole?" (*Id.* at pp. 1104-1105.) "[The officer] reached out and grabbed [the defendant], but [the] defendant started to pull away 'violently.' As defendant continued to actively resist, [the officer] put defendant in an arm-shoulder lock and put him on the ground and handcuffed him. [The officer] arrested defendant and searched him incident to arrest." (*Id.* at p. 1104.)

The appellate court concluded in *Garry*: "No matter how politely [the officer] may have stated his probation/parole question, any reasonable person who found himself in defendant's circumstances, suddenly illuminated by a police spotlight with a uniformed, armed officer rushing directly at him asking about his legal status, would believe themselves to be 'under compulsion of a direct command by the officer.' [Citation.]" (*Garry*, *supra*, 156 Cal.App.4th at p. 1112.) This case is unlike *Garry*.

The totality of circumstances reflects that the officers initiated a consensual encounter when they pulled to the curb and approached defendant. The encounter remained consensual while Officer Hart asked defendant, who remained on his bicycle, a few questions and pat-searched him with his permission. Until Officer Hart asked defendant to sit on the curb, there were no objective circumstances to suggest that defendant was not free to leave or end the exchange.

11

Defendant argues that he was definitely under detention when the officer ordered him to sit on the curb and that detaining him without cause until the warrant check was completed was illegal, quoting *People v. Bouser* (1994) 26 Cal.App.4th 1280, 1286 (*Bouser*).  Defendant states that "it is of little practical difference whether this court deems the detention to have begun immediately upon initial contact with law enforcement or when [he] was ordered to sit down on the curb . . . ."  The People assert that when defendant was asked to sit on the curb, it was a detention supported by reasonable suspicion.

We agree that Officer Hart's request that defendant go sit on the curb constituted a detention under the circumstances.  (See *People v. Foranyic* (1998) 64 Cal.App.4th 186, 188 [The defendant "was detained when he complied with the officer's direction that he step away from his bicycle."]; *In re J.G.* (2014) 228 Cal.App.4th 402, 411 [under the circumstances, officer's request that minor sit on the curb constituted a detention].)  But we do not agree that the detention was unreasonable.

We recognize that a person "may not be detained even momentarily without reasonable, objective grounds for doing so . . . .  [Citation.]" (*Royer*, *supra*, 460 U.S. at p. 498.)  But "the central inquiry under the Fourth Amendment" is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." (*Terry*, *supra*, 392 U.S. at p. 19.)  We think that standard is met here.

In *Bouser*, an officer had asked general information questions of the defendant, he filled out a field interview card, and he engaged in small talk with defendant while running a records check.  (*Bouser*, *supra*, 26 Cal.App.4th at p. 1282.)  When the records check revealed an outstanding warrant, the officer arrested the defendant.  (*Id.* at p. 1283.)  The officer found tar heroin in the defendant's pants pocket, impliedly during a search incident to arrest.  (*Ibid.*)

The appellate court in *Bouser* found no Fourth Amendment violation because the defendant "was free to terminate the encounter at any point up to his arrest."  (*Bouser*,

*supra*, 26 Cal.App.4th at p. 1288.)  It determined that commencing a warrant check does not "automatically conver[t] a consensual encounter into a Fourth Amendment seizure" and that, under the particular circumstances, the defendant had not been detained.  (*Id*. at pp. 1287-1288.)

Defendant takes out of context *Bouser*'s statement that "commencing a warrant check does not constitute a seizure per se but *detaining* a person without cause until a warrant check is completed is illegal.  [Citations.]"  (*Bouser*, *supra*, 26 Cal.App.4th at p. 1286.)  That statement was made in reference to another case where a defendant was actually detained "without an articulable suspicion of criminal activity pending completion of the warrant check . . . ."  (*Id*. at p. 1285.)

A law enforcement "officer's knowledge of a recent arrest warrant creates a reasonable suspicion the individual was involved in criminal activity thus justifying a brief detention to determine the status of the warrant."  (*People v. Conway* (1990) 222 Cal.App.3d 806, 808; see *Hensley*, *supra*, 469 U.S. at p. 229 ["[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion."]; see also *Whiteley v. Warden, Wyoming State Penitentiary* (1971) 401 U.S. 560, 568, called into doubt on another ground in *Arizona v. Evans* (1995) 514 U.S. 1, 13 ["Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause."].)  Here, the officers' reasonable suspicion, based on the radio transmission from the City of Salinas Police Department that there was an outstanding felony warrant for defendant's arrest, justified the very brief detention to obtain verification of the warrant from the Monterey County Sheriff's office.  Defendant does not dispute the validity of the arrest warrant.

13

We find no Fourth Amendment violation warranting application of the exclusionary rule.[4]  The trial court properly denied defendant's motion to suppress.

B.  *Proposition 47*

Defendant argues that, since the Safe Neighborhoods Act contains no savings clause or the functional equivalent, the Act's reduction of penalties retroactively applies under the *Estrada* rule to defendants who were sentenced prior to the proposition's effective date, but whose judgments were not final on the effective date.  He contends that retroactive application of the Act requires his conviction under former Health & Safety Code section 11377, subdivision (a), to be reduced to a misdemeanor.[5]

---

[4] Ordinarily, the People may not on appeal advance a new theory to support the denial of a defendant's motion to suppress.  (*Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 640-641; but see *People v. Moore* (2006) 39 Cal.4th 168, 177 [following an appellate reversal, it may be appropriate to remand for a new suppression hearing where there was a significant, intervening change in the law].)  In this case, the People did not raise the attenuation exception to exclusionary rule below or on appeal.  Here, we merely note that the United States Supreme Court has recently held that evidence (a baggie of methamphetamine and drug paraphernalia) discovered on a person during a search incident to arrest pursuant to warrant was admissible "because the unlawful stop was sufficiently attenuated by the pre-existing arrest warrant."  (*Utah v. Strieff* (2016) __ U.S. __, __ [136 S.Ct. 2056, 2063.)  The court explained:  "Although the illegal stop was close in time to [the defendant's] arrest, that consideration is outweighed by two factors supporting the State.  The outstanding arrest warrant for [the defendant's] arrest is a critical intervening circumstance that is wholly independent of the illegal stop.  The discovery of that warrant broke the causal chain between the unconstitutional stop and the discovery of evidence by compelling [the officer] to arrest [the defendant].  And, it is especially significant that there is no evidence that [the officer's] illegal stop reflected flagrantly unlawful police misconduct."  (*Ibid.*; cf. *People v. Brendlin* (2008) 45 Cal.4th 262, 272 ["outstanding warrant sufficiently attenuated the connection between the unlawful traffic stop and the subsequent discovery of the drug paraphernalia"].)

[5] Defendant incongruously also requests this court to remand this case, if we find the court properly denied motion to suppress, in order to permit him to seek resentencing under section 1170.18.  An inmate seeking resentencing under section 1170.18 is required to timely file a petition for recall of sentence.  (See § 1170.18, subds. (a), (b), (j).)  This appeal is not from an erroneous denial of such a petition.  There is no basis for this court to remand this matter for consideration of such a petition.  (See § 1260.)

14

The People argue that relief under the Act may not be obtained in the first instance on appeal and that, to obtain such relief, defendant must file a petition under section 1170.18 after his judgment is final.[6] The issue of whether the Act applies retroactively to a defendant who was sentenced before its effective date but whose judgment was not final until after that date is currently pending before the Supreme Court in *People v. Dehoyos* , review granted September 30, 2015, S228230 (*Dehoyos*).[7] We now consider whether the *Estrada* rule applies in this case.

"[The California Supreme Court's] decision in *Estrada* . . . supports an important, contextually specific qualification to the ordinary presumption that statutes operate prospectively:  When the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date.  [Citation.]"  (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted (*Brown*); see *People v. Conley* (2016) 63 Cal.4th 646, 656 (*Conley*).)  "The *Estrada* rule rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends ameliorative changes to the criminal law

---

[6] This court has held that the resentencing provisions of section 1170.18 "apply to all those with felony dispositions, including those placed on probation who otherwise meet the conditions specified in the statutory scheme."  (*People v. Garcia* (2016) 245 Cal.App.4th 555, 559.)

[7] The Supreme Court has indicated that *Dehoyos* presents the following issue:  "Does the Safe Neighborhood[s] and Schools Act [Proposition 47] (Gen. Elec. (Nov. 4, 2014)), which made specified crimes misdemeanors rather than felonies, apply retroactively to a defendant who was sentenced before the Act's effective date but whose judgment was not final until after that date?" (<http://www.courts.ca.gov/documents/AUG1216crimpend.pdf>[as of Aug. 16, 2016].) The court has also granted review in *People v. Delapena* (2015) 238 Cal.App.4th 1414, review granted Oct. 28, 2015, S229010 (holding for lead case) and in *People v. Lopez* (2015) 238 Cal.App.4th 177, review granted Oct. 14, 2015, S228372 (same).

15

to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not." (*Conley*, *supra*, at p. 657.)

The *Estrada* court reasoned: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Estrada*, *supra*, 63 Cal.2d at p. 745.)

"*Estrada* is today properly understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all *nonfinal judgments*. [Citation.]"[8] (*Brown*, *supra*, 54 Cal.4th at p. 324, italics added.) "[F]or the purpose of determining retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed. [Citations.]" (*People v. Nasalga* (1996) 12 Cal.4th 784, 790, fn. 5 (*Nasalga*) (plur. opn. of Werdegar, J.).)

---

[8] Section 3 states: "No part of it is retroactive, unless expressly so declared." The Civil Code and the Code of Civil Procedure contain identical provisions (Civ. Code, § 3; Code Civ. Proc., § 3).

16

As a general rule, "*Estrada* stands for the proposition that, 'where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed.' (*Estrada*, *supra*, 63 Cal.2d at p. 748.)" (*Nasalga*, *supra*, 12 Cal.4th at p. 792 (plur. opn. of Werdegar, J.).) But "[t]o ascertain whether a statute should be applied retroactively, legislative intent is the 'paramount' consideration . . . ." (*Ibid*.) "Because the *Estrada* rule reflects a presumption about legislative intent, rather than a constitutional command, the Legislature (or here, the electorate) may choose to modify, limit, or entirely forbid retroactive application of ameliorative criminal law amendments if it so chooses." (*Conley*, *supra*, 63 Cal.4th at p. 656.) *Estrada* "recognizes that the retroactive application of ameliorative changes to the criminal laws is ultimately governed by the intent of the legislative body." (*Id*. at p. 661.)

Insofar as defendant is contending that he may bypass the resentencing procedure established by section 1170.18 and be automatically resentenced under the *Estrada* rule, we reject that contention based upon the apparent intent of the voters. Section 1170.18, which was added by the 2014 Safe Neighborhoods and Schools Act (Voter Information Guide, *supra*, text of Prop. 47, § 14), provides the procedure for previously sentenced defendants to seek resentencing by filing a petition for recall of sentence. That procedure was impliedly modeled on the resentencing procedure established by section 1170.126, added by the "Three Strikes Reform Act of 2012" (Three Strikes Reform Act) enacted when the voters approved Proposition 36. (See Voter Information Guide, Gen. Elec. (Nov. 6, 2012), text of Prop. 36, §§ 1, 6.)

Section 1170.18 allows eligible inmates, who are currently serving a sentence for a conviction of a felony or felonies and who would have been guilty of a misdemeanor if the Safe Neighborhoods Act had been in effect at the time of the offense, to seek resentencing under the Act's ameliorative provisions by timely filing a petition for recall of sentence. (§ 1170.18, subds. (a), (b), (j).) Section 1170.126, subdivision (b), allows

17

eligible inmates, who are presently serving an indeterminate term of life imprisonment as third strike offenders under Three Strikes law (§§ 667, subd. (e)(2); 1170.12, subd. (c)(2)) for offenses that are not defined as serious and/or violent felonies (see §§ 667.5, subd. (c); 1192.7, subd. (c)) to seek resentencing under the ameliorative provisions of the Three Strikes Reform Act (Prop. 36) by timely filing a petition for recall of sentence. Both section 1170.18 and section 1170.126 disqualify inmates from resentencing based on specified prior convictions.[9] Under both section 1170.18 and section 1170.126, the court receiving a petition for recall of sentence may decline to resentence an otherwise eligible petitioner if it determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety.[10] (§§ 1170.18, subd. (b), 1170.126, subd. (f).)

---

[9] Section 1170.18, subdivision (i), provides: "The provisions of this section shall not apply to persons who have one or more prior convictions for an offense specified in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or for an offense requiring registration pursuant to subdivision (c) of Section 290." Section 1170.126, subdivision (e), provides: "An inmate is eligible for resentencing if . . . [¶] . . . [¶] (3) The inmate has no prior convictions for any of the offenses appearing in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or clause (iv) of subparagraph (C) of paragraph (2) of subdivision (c) of Section 1170.12."

[10] Under both provisions, the court may consider all of the following in exercising its discretion to decide the potential risk to the public of resentencing: "(1) The petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes"; "(2) The petitioner's disciplinary record and record of rehabilitation while incarcerated"; and "(3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.18, subd. (b); 1170.126, subd. (g).) Unlike section 1170.126, however, section 1170.18 explicitly defines the phrase "unreasonable risk of danger to public safety." (§ 1170.18, subd. (c).) The following issue is pending before the California Supreme Court: "Does the definition of 'unreasonable risk of danger to public safety' (Pen. Code, § 1170.18, subd. (c)) under Proposition 47 ('the Safe Neighborhoods and Schools Act') apply to resentencing under the Three Strikes Reform Act of 2012 (Pen. Code, § 1170.126)?" (*People v. Valencia* (2014) 232 Cal.App.4th 514, review granted Feb. 18, 2015, S223825; *People v. Chaney* (2014) 231 Cal.App.4th 1391, review granted Feb. 18, 2015, S223676; see *People v. Florez* (2016) 245 Cal.App.4th (continued)

18

The California Supreme Court has recently held in *Conley* that third strike offenders who were sentenced under Three Strikes law before the effective date of the Three Strikes Reform Act (Prop. 36), but whose judgments were not yet final as of that date, are not entitled to automatic resentencing under the reasoning of *Estrada*. (*Conley*, *supra*, 63 Cal.4th at pp. 651, 661-662.) We find the court's analysis compelling in the analogous situation under the Safe Neighborhoods Act.

In *Conley*, the Supreme Court stated: "[U]nlike the statute at issue in *Estrada, supra,* 63 Cal.2d 740, the [Three Strikes] Reform Act is not silent on the question of retroactivity. Rather, the Act expressly addresses the question in section 1170.126, the sole purpose of which is to extend the benefits of the Act retroactively. Section 1170.126 creates a special mechanism that entitles all persons 'presently serving' indeterminate life terms imposed under the prior law to seek resentencing under the new law. By its terms, the provision draws no distinction between persons serving final sentences and those serving nonfinal sentences, entitling both categories of prisoners to petition courts for recall of sentence under the Act." (*Conley*, *supra*, 63 Cal.4th at p. 657.) The court observed that, in enacting section 1170.126, voters " took the extraordinary step of

1176, review granted June 8, 2016, S234168 (holding for lead case); *People v. Myers* (2016) 245 Cal.App.4th 794, review granted May 25, 2016, S233937 [same]; *People v. Garcia* (2016) 244 Cal.App.4th 224, review granted April 13, 2016, S232679 [same]; *People v. Lopez* (2015) 236 Cal.App.4th 518, review granted July 15, 2015, S227028 [same]; *People v. Sledge* (2015) 235 Cal.App.4th 1191, review granted July 8, 2015, S226449 [same]; *People v. Guzman* (2015) 235 Cal.App.4th 847, review granted June 17, 2015, S226410 [same]; *People v. Crockett* (2015) 234 Cal.App.4th 642, review granted May 13, 2015, S225198 [same]; *People v. Rodriguez* (2015) 233 Cal.App.4th 1403, review granted April 29, 2015, S225047 [same]; *People v. Aparicio* (2015) 232 Cal.App.4th 1065, review granted March 25, 2015, S224317 [same]; *People v. Payne* (2014) 232 Cal.App.4th 579, review granted March 25, 2015, S223856 [same]; *People v. Superior Court (Burton)* (2015) 232 Cal.App.4th 1140, review granted March 25, 2015, S223805 [same]; *People v. Superior Court (Williams)* (2015) 232 Cal.App.4th 1149, review granted March 25, 2015, S223807 [same]; *People v. Davis* (2015) 234 Cal.App.4th 1001, review granted June 10, 2015, S225603 [same].)

19

extending the retroactive benefits of the Act beyond the bounds contemplated by *Estrada*—including even prisoners serving *final* sentences within the Act's ameliorative reach—but subject to a special procedural mechanism for the recall of sentences already imposed." (*Conley*, *supra*, 63 Cal.4th at pp. 657-658.) It stated: "In prescribing the scope and manner of the Act's retroactive application, the voters did not distinguish between final and nonfinal sentences, as *Estrada* would presume, but instead drew the relevant line between prisoners 'presently serving' indeterminate life terms—whether final or not—and defendants yet to be sentenced." (*Id*. at p. 658.)

In *Conley,* the Supreme Court pointed out that "[t]he recall procedures in Penal Code section 1170.126 were designed to strike a balance between [the] objectives of mitigating punishment and protecting public safety by creating a resentencing mechanism for persons serving indeterminate life terms under the former Three Strikes law, but making resentencing subject to the trial court's evaluation of whether, based on their criminal history, their record of incarceration, and other relevant considerations, their early release would pose an 'unreasonable risk of danger to public safety.' ([§ 1170.126]*,* subd. (f).)" (*Conley*, *supra*, 63 Cal.4th at p. 658.) The court concluded: "Where, as here, the enacting body creates a special mechanism for application of the new lesser punishment to persons who have previously been sentenced, and where the body expressly makes retroactive application of the lesser punishment contingent on a court's evaluation of the defendant's dangerousness, we can no longer say with confidence, as we did in *Estrada*, that the enacting body lacked any discernible reason to limit application of the law with respect to cases pending on direct review. On the contrary, to confer an automatic entitlement to resentencing under these circumstances would undermine the apparent intent of the electorate that approved section 1170.126: to create broad access to resentencing for prisoners previously sentenced to indeterminate life terms, but subject to judicial evaluation of the impact of resentencing on public safety, based on the prisoner's criminal history, record of incarceration, and other factors. This

20

public safety requirement must be applied realistically, with careful consideration of the [Three Strikes] Reform Act's purposes of mitigating excessive punishment and reducing prison overcrowding. But given that section 1170.126, by its terms, applies to all prisoners 'presently serving' indeterminate life terms, we can discern no basis to conclude that the electorate would have intended for courts to bypass the public safety inquiry altogether in the case of defendants serving sentences that are not yet final." (*Id.* at pp. 658-659.)

In concluding that the voters did not intend to confer a right to automatic resentencing under the amended penalty provisions of the Three Strikes Reform Act, the Supreme Court additionally observed in *Conley* that "unlike in *Estrada,* the revised sentencing provisions at issue in this case do more than merely reduce previously prescribed criminal penalties." (*Conley*, *supra*, 63 Cal.4th at p. 659.) It pointed out that the revised sentencing provisions "establish a new set of disqualifying factors that preclude a third strike defendant from receiving a second strike sentence. (See Pen.Code, § 1170.12, subd. (c)(2)(C).)" (*Ibid*.)

Application of *Conley*'s analysis in this case refutes defendant's argument that defendants who were sentenced before the effective date of the Safe Neighborhoods Act, but whose judgments were not yet final as of that date, are entitled to automatic resentencing. Like the Three Strikes Reform Act (Prop. 36), the Safe Neighborhoods Act (Prop. 47) "is not silent on the question of retroactivity," and it expressly addresses that question in a statutory provision (see § 1170.18), "the sole purpose of which is to extend the benefits of the Act retroactively." (*Conley*, *supra*, 63 Cal.4th at p. 657.) Like section 1170.126, section 1170.18 does not distinguish between inmates serving final sentences and those serving nonfinal sentences, "entitling both categories of prisoners to petition courts for recall of sentence . . . ." (*Conley*, *supra*, at p. 657.)

The Safe Neighborhoods Act explicitly stated that the act "[r]equire[s] a thorough review of criminal history and risk assessment of any individuals before resentencing to

21

ensure that they do not pose a risk to public safety." (Voter Information Guide, *supra*, text of Prop. 47, § 3, subd. (5), p. 70.) The ballot materials explained that the initiative measure "allows certain offenders who have been previously convicted of such crimes to apply for reduced sentences." (*Id.*, Analysis of Legislative Analyst, p. 35.) But the ballot materials also assured the voters: "[N]o offender who has committed a specified severe crime could be resentenced or have their conviction changed. In addition, the measure states that a court is not required to resentence an offender currently serving a felony sentence if the court finds it likely that the offender will commit a specified severe crime." (*Id.*, p. 36.) The rebuttal to the argument against Proposition 47 emphasized that approval of the proposition would not require automatic release of anyone and it included "strict protections to protect public safety." (*Id.*, rebuttal to argument against Prop. 47 p. 39.) Thus, it may be inferred from the text of the Safe Neighborhoods Act and its legislative history that the voters intended its ameliorative statutory changes to have circumscribed retroactive effect with respect to those already sentenced before its effective date and that eligible defendants who had already been sentenced would be required to seek resentencing under section 1170.18.

Although the rule of *Estrada* is inapplicable here, the resentencing procedure established by section 1170.18 may be available to defendant. (See § 1170.18, subd. (j) [A petition for recall of sentence must be "filed within three years after the effective date of the act that added this section or at a later date upon a showing of good cause"]; cf. *Conley*, *supra*, 63 Cal.4th at p. 662, fn. 5.)

DISPOSITION

The judgment is affirmed.

_____

ELIA, ACTING P.J.

WE CONCUR:

_____

BAMATTRE-MANOUKIAN, J.

_____

MIHARA, J.