Filed 5/13/21  P. v. Cho CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY CHO,<br><br>      Defendant and Appellant. | H046609<br>(Santa Clara County<br>Super. Ct. No. C1775736) |

After his motion to suppress was denied, defendant pleaded no contest to failing to update his sex offender registration after moving to a new address.  Challenging the suppression ruling on appeal, he argues his arrest for the registration violation was tainted by an unlawful detention in which he was approached and questioned by a police officer.  We conclude that a seizure occurred under the Fourth Amendment, and because its scope was not reasonably related to its objectively lawful purpose, it resulted in an unlawful detention.  We will therefore reverse the judgment and remand the matter with instructions to vacate the order denying the motion.

## I.  BACKGROUND

Defendant was approached by an officer on late night patrol as he was walking in a Milpitas neighborhood.  The officer asked defendant questions, and upon learning that defendant was staying or living at his sister's home and was required to register as a sex offender, the officer performed a records check which revealed that defendant was not

registered at his sister's address. The officer engaged defendant in further conversation about his residence and registration responsibilities before parting ways.

Two weeks later and after reviewing the initial officer's report, a different officer surveilled defendant's sister's home, and followed defendant who was picked up from the residence in a car driven by a female. After speaking with the female, defendant, and defendant's brother-in-law, defendant was arrested for failing to register a change of address. Defendant was charged in an amended information with being a transient sex offender who failed register after moving to a residence. (Pen. Code, § 290.011, subd. (b).) The information alleged two prior convictions for failing to register as a sex offender, within the meaning of Penal Code section 667.5, subdivision (b).

Defendant moved to suppress all evidence based on an unlawful detention and arrest, arguing his encounter with the first officer was an unlawful detention, and "the things that led up to the arrest … are fruit of the poisonous tree from the initial detention." At the hearing on defendant's motion, Lieutenant Hernandez testified as the City of Milpitas police officer who initially contacted defendant. He stated that he was on duty, in uniform, and driving a marked patrol car south on Arizona Avenue at about 1:30 a.m. As he was approaching Coelho Street, he noticed defendant walking and holding a paper bag to his mouth as he stepped into the intersection. Lieutenant Hernandez "thought [he] recognized [defendant] from before" and decided to "stop[] to talk to him," because he was curious as to how he knew him. He parked his patrol car on Arizona Avenue north of Coelho Street as defendant proceeded across the intersection. Lieutenant Hernandez stepped out of his patrol car and illuminated defendant with his spotlight because the street was dimly lit. Lieutenant Hernandez's first words to defendant were, "Hey, where do I know you from?" Defendant said something to the effect of "I'm just going home" or "I live there," pointing to a house on the corner. Defendant did not appear to recognize Lieutenant Hernandez. But Lieutenant Hernandez still thought defendant looked familiar, so he asked defendant whether he was on

2

probation or parole because he "was seeking the reason why he seemed familiar." Defendant answered that he had been on probation and he was a sex registrant.

Lieutenant Hernandez conducted a records check to see if defendant's sex offender registration was current, and was informed that defendant was registered in San Jose. A lengthier conversation then ensued about defendant's residence. Lieutenant Hernandez asked defendant how long he had been staying at the Arizona Avenue home. At different points in the conversation, defendant said he was "just visiting," or he was staying over that night because it was too late to go home. At one point, the lieutenant said " 'You told me you live here,' " and defendant said "no." Later in the conversation defendant said the house was his sister's and he had been staying there for about a month. Defendant acknowledged having initialed the conditions of registration. Lieutenant Hernandez decided not to pursue any registration noncompliance at that time because it was the middle of the night and he did not have a copy of defendant's paperwork. Lieutenant Hernandez told defendant he needed to register with the Milpitas Police Department, and defendant said he would do so the next day. Lieutenant Hernandez watched defendant use a front door key to enter his sister's house. He estimated the encounter lasted 15 to 20 minutes.

Lieutenant Hernandez specifically testified that defendant was not detained for an alcohol violation: "[I]n my experience in dealing with people that are drinking from paper bags, the majority of the time it's alcohol. In this situation I saw it. I recognized that that could be a possibility, but I engaged [defendant] in a consensual encounter. I didn't say stop. I didn't say police. I asked him where I knew him from. We had a conversation. He told me he was coming from 7-Eleven [be]cause he went to go get a drink. [¶] … [¶] After the encounter I did confirm that it was alcohol." Lieutenant Hernandez clarified that in other contexts knowing whether someone he makes contact with is on probation or parole may be important because of curfew or alcohol restrictions. But that was not why he made that inquiry here: "Here[,] I have a person that's out late –

3

1:30 in the morning. They have an open container. But in this context all I wanted to know is where I knew him from."

Defendant testified that he was walking to his sister's house from a 7-Eleven where he had bought a beer. He noticed a car approaching, and "[s]uddenly the light's like real bright at me," so he shielded his face with his right forearm. The car passed him, turned around, came back toward him, and parked in front of his sister's house. Lieutenant Hernandez asked defendant whether he knew him, and defendant said "No, I don't think so." The lieutenant asked defendant whether he was on probation or parole, and defendant said he used to be on probation. The lieutenant asked what for, and defendant told him he was "a 290." Lieutenant Hernandez asked about the house defendant had pointed to. Defendant said it was his sister's house, and he denied living there. At no point did Lieutenant Hernandez draw his weapon, ask defendant to sit on the ground, or handcuff defendant. Defendant testified he did not feel he was free to end the encounter and walk away. He also described feeling scared when he denied living at his sister's house and Lieutenant Hernandez "kept [] aggressively [] telling me I'm lying."

Defendant argued that a detention occurred without reasonable suspicion, tainting the ultimate probable cause to arrest two weeks later. The prosecution argued that the contact was consensual. And if it were viewed as a detention, it was lawful in light of defendant's statements that he was a 290 registrant headed home. When pressed by the court as to what criminal activity is presented by defendant's status as a sex offender registrant, the prosecutor then argued that the lieutenant's conduct was justified by the apparent open container violation.

The trial court ruled that Lieutenant Hernandez detained defendant within the meaning of the Fourth Amendment because a reasonable person would not have felt free to leave given the late hour, the bright spotlight, and the "accusatory" nature of the officer's questions. But the court also ruled the detention was justified by the apparent open container violation. It noted a dispute in the evidence regarding whether at the

4

outset defendant said he was living at his sister's house or merely staying there for the night. Without resolving the dispute, the court found Lieutenant Hernandez had interpreted defendant's initial statement to mean he was living at the house, and "the detention was [not] unduly prolonged with him running the records check and continuing the conversation and attempting to clarify the situation."

After the motion was denied, the prosecutor amended count 1 to a misdemeanor, and defendant entered a no contest plea to the amended count. Imposition of sentence was suspended, defendant was placed on two years' informal probation, and ordered to serve 30 days in county jail.

## II. DISCUSSION

The federal and California constitutions prohibit unreasonable searches and seizures. (U.S. Const., 4th & 14th Amends.; Cal. Const., art. I, § 13.) California law applies federal constitutional standards to the review of search and seizure rulings. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156, fn. 8.) A consensual encounter between a law enforcement officer and a citizen does not constitute a seizure under the Fourth Amendment. (*Florida v. Bostick* (1991) 501 U.S. 429, 434.) An encounter is consensual if a reasonable person would feel free to leave or to refuse to cooperate with the officer. (*Id*. at pp. 431, 434.) A seizure, or detention, occurs when an officer restrains a person's liberty by means of either physical force or a show of authority. (*Brendlin v. California* (2007) 551 U.S. 249, 254.)

The California Supreme Court has elaborated on the test to distinguish between a consensual encounter and a detention: "The United States Supreme Court has made it clear that a detention does not occur when a police officer merely approaches an individual on the street and asks a few questions. [Citation.] As long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual and no reasonable suspicion is required on the part of the officer. Only when the officer, by means of physical force or show of authority, in some manner

5

restrains the individual's liberty, does a seizure occur. [Citations.] '[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.' [Citation.] This test assesses the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation. [Citation.] Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled. [Citations.] The officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.)

In our review of a trial court's ruling on a motion to suppress, we review factual findings for substantial evidence, and make factual inferences in favor of the trial court's ruling. (*People v. Zamudio* (2008) 43 Cal.4th 327, 342.) We exercise our independent judgment to determine whether a seizure occurred and whether any seizure was reasonable under the Fourth Amendment. (*Ibid.*; *People v. Glaser* (1995) 11 Cal.4th 354, 362.)

## A. DEFENDANT WAS DETAINED BY LIEUTENANT HERNANDEZ

Defendant argues that his encounter with Lieutenant Hernandez was not consensual because a reasonable person would not have felt free to leave when Lieutenant Hernandez stopped his patrol car alongside defendant, immediately got out, illuminated defendant with a spotlight, and approached defendant while asking "accusatory questions." He argues the facts are analogous to those in *People v. Garry* (2007) 156 Cal.App.4th 1100 (*Garry*) and *People v. Kidd* (2019) 36 Cal.App.5th 12 (*Kidd*). The Attorney General relies largely on *People v. Chamagua* (2019)

6

33 Cal.App.5th 925 (*Chamagua*) and *People v. Bouser* (1994) 26 Cal.App.4th 1280 (*Bouser*) to argue that defendant's movements were not restrained by a show of authority.

From his patrol car at a distance of about 35 feet, the officer in *Garry* observed the defendant on a street corner in a high crime area at night. (*Garry*, *supra*, 156 Cal.App.4th at pp. 1103–1104.) The officer directed the patrol car spotlight on Garry and walked briskly toward him. (*Id*. at p. 1104.) Garry started walking backwards and said " 'I live right there,' " pointing to a house. (*Ibid*.) As the officer approached, he said " 'Okay, I just want to confirm that,' " and asked Garry whether he was on probation or parole. (*Ibid*.) The appellate court concluded that the officer's actions, "taken as a whole, would be very intimidating to any reasonable person." (*Id*. at p. 1111.) Garry was "bathed [] in light" as the officer advanced "35 feet in 'two and a-half [to] three seconds' … while questioning him about his legal status" and "disregarding Garry's indication that he was merely standing outside his home." (*Ibid*.) Rather than engage in conversation, the officer "immediately and pointedly inquired about defendant's legal status as he quickly approached." (*Id*. at pp. 1111–1112.) The officer's actions "constituted a show of authority so intimidating as to communicate to any reasonable person that he or she was ' "not free to decline [the officer's] requests or otherwise terminate the encounter." ' " (*Ibid*.)

In *Kidd*, the appellate court found a detention where a patrol officer saw two people sitting in a parked car on a residential street late at night. (*Kidd*, *supra*, 36 Cal.App.5th at p. 15.) The officer passed the car, made a U-turn, parked 10 feet behind the car, and pointed two spotlights at the car. (*Ibid*.) The court recognized that the officer did not "unambiguously signal a detention" by blocking Kidd's car or illuminating emergency lights. (*Id*. at p. 21.) It reasoned, however, that "motorists are trained to yield immediately when a law enforcement vehicle pulls in behind them and turns on its lights." (*Ibid*.) And "[r]egardless of the color of the lights the officer turned

7

on, a reasonable person in Kidd's circumstances 'would expect that if he drove off, the officer would respond by following with red light on and siren sounding ... .' " (*Ibid.*)

In *Chamagua*, two deputies observed a pedestrian at night quickly change course after noticing their patrol car and walk into an apartment complex driveway. (*Chamagua*, *supra*, 33 Cal.App.5th at p. 927.) The deputies pulled alongside Chamagua, got out of the car, and asked " 'Hey, how are you doing? What's your name? Do you got anything illegal on you?' " (*Ibid.*) Concluding the encounter was consensual, the appellate court reasoned that the deputies did not use or threaten force or command Chamagua to do anything. (*Id.* at p. 929.) It also noted that asking incriminating questions does not turn an encounter into a detention, even if those targeted with questions believe themselves the object of official scrutiny. (*Ibid.*)

In *Bouser*, the officer observed the defendant in daylight standing by a dumpster in an alley known for drug dealing. (*Bouser*, *supra*, 26 Cal.App.4th at p. 1282.) The officer stopped his patrol car about four feet behind Bouser, and walked toward him asking " 'Hey, how you doing? You mind if we talk?' " (*Ibid.*) Bouser agreed, and the officer asked general questions such as his name, date of birth, arrest history, and what he was doing there. (*Ibid.*) For the next three to five minutes, the officer filled out a field card and ran a warrants check while making " 'small talk.' " (*Ibid.*) Bouser "just [stood] there, not causing [] any problems." (*Ibid.*) Two justices found the encounter did not constitute a seizure: Although Bouser reasonably may have felt himself the subject of general suspicion when the officer checked for outstanding warrants over the radio, neither the questions nor the records check related to specific and identifiable criminal activity. (*Id.* at p. 1287.) The officer did not order Bouser to do anything while undertaking the records check, nor did the officer draw his weapon, gesture in a threatening manner, or utilize the patrol car's lights or siren. (*Ibid.*) The dissenting justice noted that Bouser was nervous and immediately walked away from the officer, but still could not shake him. (*Id.* at p. 1289.) In that justice's view, a reasonable person in

8

Bouser's circumstances would not believe the officer would allow him to leave. (*Ibid*.) And a reasonable person would not have felt free to walk away during the records check: "The ordinary honest sort would consider that poor citizenship at best, illegal at worst; an experienced street person would know it would probably only aggravate a deteriorating situation and might have unpleasant physical consequences." (*Ibid*.)

We find *Kidd* readily distinguishable because it involved a vehicle and its reasoning relies on a motorist's state of mind. *Bouser* is also distinguishable given that the encounter there occurred during the day and did not involve a spotlight or accusatory questions. While both the instant case and *Chamagua* involve pedestrians approached by officers in a patrol car, the officer in *Chamagua* did not spotlight the defendant or open the conversation with an accusatory question.

The Attorney General distinguishes *Garry*, arguing that there the officer's conduct was intimidating from the inception, while here Lieutenant Hernandez did not approach defendant "headlong" or "pose[] questions in an intimidating voice." But even though there was no evidence Lieutenant Hernandez approached defendant on foot in a hurried manner, defendant testified that Lieutenant Hernandez drove by him with bright lights before turning around and parking. Lieutenant Hernandez testified that he came to a slow stop as he approached defendant while defendant walked in his direction. Lieutenant Hernandez turned his spotlight on defendant as he got out of the car, and the trial court found he immediately confronted defendant with non-conversational accusatory questions. It was also late at night and defendant was alone. The fact that defendant walked toward Lieutenant Hernandez does not demonstrate consent, because he had parked directly in front of the house where defendant was headed.

The facts here are similar to those in *People v. Roth* (1990) 219 Cal.App.3d 211 (*Roth*). There the court found a detention occurred when two deputies approached Roth as he was walking in a deserted grocery store parking lot around 1:30 a.m. (*Id*. at p. 213.) The deputies shined their spotlight on Roth, stopped the patrol car, and both deputies got

out.  The driver stood behind the open car door and said, "I would like to talk to you," or "Come over here.  I want to talk to you." (*Ibid.*)  The *Roth* court reasoned that a reasonable person in that situation would not feel free to leave.  (*Id*. at p. 215.)  (One justice concurred solely based on the trial court's finding that the deputy had commanded Roth to engage in conversation.  (*Id*. at p. 216 [conc. opn. of Todd, J.].))

The Attorney General argues use of the spotlight was justified for officer safety and did not restrict defendant's movement, citing *People v. Perez* (1989) 211 Cal.App.3d 1492.  In *Perez*, two people were in an unlit parked car in a dark corner of a motel parking lot known for drug dealing and prostitution.  (*Id*. at p. 1494.)  The officer positioned his patrol car "head on" with Perez's car and turned on its high beams and spotlights to get a better look at the occupants and gauge their reaction.  (*Ibid*.)  He left "plenty of room" for Perez to drive away and observed Perez and his passenger slouched over in the front seat.  (*Ibid*.)  The officer approached after Perez and the passenger were unresponsive to the lights and he became concerned regarding their sobriety.  (*Ibid.*)  The court found no detention occurred because the officer did not block Perez's way or activate emergency lights.  (*Id*. at p. 1496.)  The court recognized that the use of high beams and spotlights might cause a reasonable person to believe they are the object of official scrutiny, but directed scrutiny did not amount to a detention.  (*Ibid*.)

In contrast to *Perez*, where the officer used the patrol car lights to view behavior from a distance and did not approach until he observed signs consistent with intoxication, here Lieutenant Hernandez parked, directed his spotlight at defendant as he got out of the car, and engaged defendant in direct questioning regarding his probation and parole status.  Considering the encounter as a whole rather than focusing on isolated details, we agree with the trial court that a reasonable person in defendant's circumstances would not

10

have believed he was free to disregard the lieutenant's questions and walk away. (See *Florida v Bostick, supra,* 501 U.S. at p. 434.)

## B. THE DETENTION WAS UNREASONABLE UNDER THE FOURTH AMENDMENT

The Attorney General argues defendant was lawfully seized because Lieutenant Hernandez had reasonable suspicion to believe defendant was drinking alcohol from a container in the paper bag. We agree that Lieutenant Hernandez would have been justified in detaining defendant to investigate possible infractions for carrying an open container or drinking in public. But according to his own testimony, that is not what happened here.

To determine whether a seizure was lawful, we consider "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." (*Terry v. Ohio* (1968) 392 U.S. 1, 20.) "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." (*Graham v. Connor* (1989) 490 U.S. 386, 397.) "[A]n investigatory detention [may] exceed constitutional bounds when extended beyond what is reasonably necessary under the circumstances which made its initiation permissible." (*People v. McGaughran* (1979) 25 Cal.3d 577, 586.) In other words, "[a] seizure for [violating the law] justifies a police investigation *of that violation.*" (*Rodriguez v. United States* (2015) 575 U.S. 348, 354 [italics added] (*Rodriguez*).) The seizure " 'must be carefully tailored to its underlying justification,' " and " may 'last no longer than is necessary to effectuate th[at] purpose.' " (*Ibid.*)

*Knowles v. Iowa* (1998) 525 U.S. 113 is instructive. The officer in *Knowles* elected to issue a citation to a motorist rather than arrest him for a state law traffic offense. (*Id*. at p. 114.) The state Supreme Court upheld the ensuing search of the vehicle, reasoning that "so long as the arresting officer had probable cause to make a custodial arrest, there need not in fact have been a custodial arrest" to justify the

11

warrantless search as a search incident to an arrest. (*Id*. at pp. 115–116.) The United States Supreme Court reversed, holding the search incident to an arrest exception to the warrant requirement does not apply where there is no actual arrest. (*Id*. at pp. 116–119.) Although the officer could have arrested the motorist, the circumstances justifying a warrantless search incident to an arrest are not present in a non-arrest setting. (*Ibid*.) This court rejected a similar argument in *People v. Espino* (2016) 247 Cal.App.4th 746, where the fact that officers could have arrested Espino for a traffic violation did not justify a vehicle search undertaken without proper authority. (*Id*. at p. 763.)

Just as the searches in *Knowles* and *Espino* were not rendered lawful by circumstances which, had they been acted upon, would have supported a lawful arrest, the detention here is not made lawful by what Lieutenant Hernandez could have but elected not to do. "The reasonableness of a seizure … depends on what the police in fact do." (*Rodriguez*, *supra*, 575 U.S.at p. 357.) Rather than investigate the possible open container infraction, Lieutenant Hernandez pursued his curiosity about defendant's identity. Indeed, he did not investigate what was in defendant's paper bag until after the encounter. Despite objectively lawful grounds for a detention, the seizure here was not carefully tailored to that purpose and was therefore unreasonable under the Fourth Amendment.

## III. DISPOSITION

The judgment is reversed. The matter is remanded, and the trial court is directed to vacate its order denying the motion to suppress and to enter a new order granting the motion. The trial court shall determine in light of the new order whether defendant's arrest was supported by probable cause.

_____

Grover, J.

**WE CONCUR:**

_____

Greenwood, P. J.

_____

Bamattre-Manoukian, J.

**H046609 -** *The People v. Cho*